

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-1997

# Queen Cty Pizza Inc v. Dominos Pizza Inc

Precedential or Non-Precedential:

Docket
96-1638

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Queen Cty Pizza Inc v. Dominos Pizza Inc" (1997). *1997 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 27, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1638

QUEEN CITY PIZZA, INC.; THOMAS C. BOLGER; SCALE
PIZZA, INC.; BAUGHANS, INC.; CHARLES F. BUCK; F.M.
PIZZA, INC.; ROBERT S. BIGELOW; BLUE EARTH
ENTERPRISES, INC.; KEVIN BORES; DAVIS PIZZA
ENTERPRISES, INC.; DIANE A. DAVIS; FISHER PIZZA,
INC.; JAMES B. FISHER, JR.; SEPCO, INC.; S&S PIZZA
CORP.; G&L PIZZA CO.; STEPHEN D. GALLUP; LUGENT
PIZZA, INC.; JOSEPH J. LUGENT; BILLIO'S PIZZA, INC.;
WILLIAM J. MURTHA; SPRING GARDEN PIZZA, INC;
BRAD L. WALKER; JRW PIZZA, INC.; JAMES R. WOOD,
Individually and as Class Representatives of a Class
Consisting of All Present and Certain Former Domino's
Franchisees in the United States; INTERNATIONAL
FRANCHISE ADVISORY COUNCIL, INC.

v.

DOMINO'S PIZZA, INC.

> Queen City Pizza, Inc.; Thomas C.
> Bolger; Scale Pizza, Inc.; Baughans,
> Inc.; Charles F. Buck; F.M. Pizza, Inc.;
> Robert S. Bigelow; Blue Earth
> Enterprises, Inc.; Kevin Bores; Davis
> Pizza Enterprises, Inc.; Diane A. Davis;
> Fisher Pizza, Inc.; James B. Fisher, Jr.;
> SEPCO, Inc.; S&S Pizza, Inc.; G&L
> Pizza, Inc.; Stephen D. Gallup; Lugent
> Pizza, Inc.; Joseph J. Lugent; Billio's
> Pizza, Inc.; William J. Murtha; Spring
> Garden Pizza, Inc.; Brad L. Walker;
> JRW Pizza, Inc.; James R. Wood; and
> International Franchise Advisory
> Council, Inc.,
>
> Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 95-cv-03777)

Argued February 28, 1997

Before: SCIRICA, ALITO and LAY,* Circuit Judges

(Filed August 27, 1997)

SHERYL G. SNYDER, ESQUIRE
  (ARGUED)
Brown, Todd & Hayburn
3200 Providian Center
Louisville, Kentucky 40202

 Attorney for Appellants

DANIEL F. KOLB, ESQUIRE
  (ARGUED)
THOMAS P. OGDEN, ESQUIRE
Davis, Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

LAURENCE Z. SHIEKMAN, ESQUIRE
Pepper, Hamilton & Scheetz
18th and Arch Streets
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-
 2799

 Attorneys for Appellee

_____

*The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Judicial Circuit, sitting by designation.

2


OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this appeal, we must decide whether certain franchise tying restrictions support a claim for violation of federal antitrust laws. Eleven franchisees of Domino's Pizza stores and the International Franchise Advisory Council, Inc. filed suit against Domino's Pizza, Inc., alleging violations of federal antitrust laws, breach of contract, and tortious interference with contract. The district court dismissed the antitrust claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted, because the plaintiffs failed to allege a valid relevant market. The district court declined to exercise supplemental jurisdiction over the plaintiffs' remaining common law claims. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp. 1055

(E.D. Pa. 1996). We will affirm.

I. Facts and Procedural History

A.

Domino's Pizza, Inc. is a fast-food service company that sells pizza through a national network of over 4200 stores. Domino's Pizza owns and operates approximately 700 of these stores. Independent franchisees own and operate the remaining 3500. Domino's Pizza, Inc. is the second largest pizza company in the United States, with revenues in excess of $1.8 billion per year.

A franchisee joins the Domino's system by executing a standard franchise agreement with Domino's Pizza, Inc. Under the franchise agreement, the franchisee receives the right to sell pizza under the "Domino's" name and format. In return, Domino's Pizza receives franchise fees and royalties.

The essence of a successful nationwide fast-food chain is product uniformity and consistency. Uniformity benefits franchisees because customers can purchase pizza from

3

any Domino's store and be certain the pizza will taste exactly like the Domino's pizza with which they are familiar. This means that individual franchisees need not build up their own good will. Uniformity also benefits the franchisor. It ensures the brand name will continue to attract and hold customers, increasing franchise fees and royalties.[1]

For these reasons, section 12.2 of the Domino's Pizza standard franchise agreement requires that all pizza ingredients, beverages, and packaging materials used by a Domino's franchisee conform to the standards set by Domino's Pizza, Inc. Section 12.2 also provides that Domino's Pizza, Inc. "may in our sole discretion require that ingredients, supplies and materials used in the preparation, packaging, and delivery of pizza be purchased exclusively from us or from approved suppliers or distributors." Domino's Pizza reserves the right "to impose reasonable limitations on the number of approved suppliers or distributors of any product." To enforce these rights, Domino's Pizza, Inc. retains the power to inspect franchisee stores and to test materials and ingredients. Section 12.2 is subject to a reasonableness clause providing that Domino's Pizza, Inc. must "exercise reasonable judgment with respect to all determinations to be made by us under the terms of this Agreement."

Under the standard franchise agreement, Domino's Pizza, Inc. sells approximately 90% of the $500 million in ingredients and supplies used by Domino's franchisees.[2] These sales, worth some $450 million per year, form a significant part of Domino's Pizza, Inc.'s profits. Franchisees purchase only 10% of their ingredients and supplies from outside sources. With the exception of fresh dough, Domino's Pizza, Inc. does not manufacture the products it sells to franchisees. Instead, it purchases these products from approved suppliers and then resells them to the franchisees at a markup.

_____

1. See the analysis of the economics of franchising in Warren S. Grimes, When Do Franchisors Have Market Power?, 65 Antitrust L.J. 105, 107-110 (1996).

2. Domino's Pizza, Inc. sells ingredients and supplies through its division, Domino's Pizza Distribution Division, "DPDD." DPDD was formerly a subsidiary of Domino's Pizza, Inc.

## B.

The plaintiffs in this case are eleven Domino's franchisees and the International Franchise Advisory Council, Inc. ("IFAC"), a Michigan corporation consisting of approximately 40% of the Domino's franchisees in the United States, formed to promote their common interests.[3] The plaintiffs contend that Domino's Pizza, Inc. has a monopoly in "the $500 million aftermarket for sales of supplies to Domino's franchisees" and has used its monopoly power to unreasonably restrain trade, limit competition, and extract supra-competitive profits. Plaintiffs point to several actions by Domino's Pizza, Inc. to support their claims.

First, plaintiffs allege that Domino's Pizza, Inc. has restricted their ability to purchase competitively priced dough. Most franchisees purchase all of their fresh dough from Domino's Pizza, Inc. Plaintiffs here attempted to lower costs by making fresh pizza dough on site. They contend that in response, Domino's Pizza, Inc. increased processing fees and altered quality standards and inspection practices for store-produced dough, which eliminated all potential savings and financial incentives to make their own dough. Plaintiffs also allege Domino's Pizza, Inc. prohibited stores that produce dough from selling their dough to other franchisees, even though the dough-producing stores were willing to sell dough at a price 25% to 40% below Domino's

Pizza, Inc.'s price.

Next, plaintiffs object to efforts by Domino's Pizza, Inc. to block IFAC's attempt to buy less expensive ingredients and supplies from other sources. In June 1994, IFAC entered into a purchasing agreement with FoodService Purchasing Cooperative, Inc. (FPC). Under the agreement, FPC was appointed the purchasing agent for IFAC-member Domino's franchisees. FPC was charged with developing a cooperative purchasing plan under which participating franchisees

_____

3. Domino's Pizza, Inc. argued before the district court that IFAC is without standing in this case. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp. 1055, 1057 (E.D. Pa. 1996). The district court apparently found it unnecessary to address this issue in light of its order
dismissing the case for failure to state a claim.

5

could obtain supplies and ingredients at reduced cost from suppliers other than Domino's Pizza, Inc. Plaintiffs contend that when Domino's Pizza, Inc. became aware of these efforts, it intentionally issued ingredient and supply specifications so vague that potential suppliers could not provide FPC with meaningful price quotations.

Plaintiffs also allege Domino's Pizza entered into exclusive dealing arrangements with several franchisees in order to deny FPC access to a pool of potential buyers sufficiently large to make the alternative purchasing scheme economically feasible. In addition, plaintiffs contend Domino's Pizza, Inc. commenced anti-competitive predatory pricing to shut FPC out of the market. For example, they maintain that Domino's Pizza, Inc. lowered prices on many ingredients and supplies to a level competitive with FPC's prices and then recouped lost profits by raising the price on fresh dough, which FPC could not supply. Further, plaintiffs contend Domino's Pizza, Inc. entered into exclusive dealing arrangements with the only approved suppliers of ready-made deep dish crusts and sauce. Under these agreements, the suppliers were obligated to deliver their entire output to Domino's Pizza, Inc. Plaintiffs allege the purpose of these agreements was to prevent FPC from purchasing these critical pizza components for resale to franchisees.

Finally, plaintiffs allege Domino's Pizza, Inc. refused to sell fresh dough to franchisees unless the franchisees purchased other ingredients and supplies from Domino's Pizza, Inc. As a result of these and other alleged practices,

plaintiffs maintain that each franchisee store now pays between $3000 and $10,000 more per year for ingredients and supplies than it would in a competitive market. Plaintiffs allege these costs are passed on to consumers.

C.

As noted, eleven Domino's franchisees and IFAC filed an amended complaint in United States District Court for the Eastern District of Pennsylvania against Domino's Pizza, Inc. seeking declaratory, injunctive, and compensatory relief under SS 1 and 2 of the Sherman Act, 15 U.S.C. SS 1

and 2. The plaintiffs also sought damages for breach of contract, breach of implied covenants of good faith and fair dealing, and tortious interference with contractual relations.4

Domino's Pizza, Inc. moved to dismiss the antitrust claims for failure to state a claim, contending the plaintiffs failed to allege a "relevant market," a basic pleading requirement for claims under both S 1 and S 2 of the Sherman antitrust act. They maintained that the relevant market defined in the complaint -- the "market" in Domino's-approved ingredients and supplies used by Domino's Pizza franchisees -- was invalid as a matter of law because the boundaries of the proposed relevant market were defined by contractual terms contained in the franchise agreement, and not measured by cross-elasticity of demand or product interchangeability.

The district court granted defendant's motion to dismiss with prejudice plaintiffs' federal antitrust claims. The district court observed that "in order to state a Sherman Act claim under either S 1 or S 2, a plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp. 1055, 1060 (E.D. Pa. 1996). Noting that plaintiffs did "not explicitly identify the relevant product and geographic markets in their amended complaint," the court said that "it is clear from the context, and confirmed in their memorandum in opposition to the instant motion, that Plaintiffs consider the relevant product market to be the market for ingredients and supplies among Domino's franchisees." Id. at 1061. Rejecting this concept of the relevant market, the court held that "antitrust claims predicated upon a `relevant market' defined by the bounds of a franchise agreement are not cognizable." Id. at 1063. The court noted that Domino's Pizza, Inc.'s power to force plaintiffs to purchase ingredients and supplies from them

stemmed "not from the unique nature of the product or

_____

4. The plaintiffs originally filed the complaint on behalf of themselves and
a purported class of all present and future Domino's franchisees in the United States. Their amended complaint abandoned their claim to represent all Domino's franchisees.

7

from its market share in the fast food franchise business, but from the franchise agreement." Id. at 1062. For that reason, plaintiffs' claims "implicate principles of contract, and are not the concern of the antitrust laws." Id. The district court also held plaintiffs had failed adequately to allege harm to competition, "a bedrock premise of antitrust law." Id. at 1063. Because plaintiffs failed to assert a cognizable antitrust claim and there was neither diversity among the parties nor special circumstances justifying exercise of supplemental jurisdiction, the court dismissed without prejudice plaintiffs' common law claims for lack of subject matter jurisdiction. Id. at 1063-64.

The district court granted plaintiffs leave to file an amended complaint to cure the jurisdictional pleading deficiencies in their state law claims. Plaintiffs decided not to replead their state law claims. Instead, they sought to amend their complaint for a second time in an attempt to state a valid federal antitrust claim. The district court denied their motion, noting that though the plaintiffs' proposed second amended complaint would cure the failure to plead harm to competition, it would not cure the failure to allege a valid relevant market. The court stated: "Plaintiffs do not and cannot purchase ingredients and supplies from alternative suppliers not because Domino's dominates the ingredient and supply market or because Defendant is the market's only supplier, but because the franchisee-plaintiffs are contractually bound to purchase only from suppliers approved by Defendant. It is economic power resulting from the franchise agreement, therefore, and not market power, that defines the `relevant market' Plaintiffs allege in support of their antitrust claims." The district court rejected plaintiffs' argument that a different result was required under the Supreme Court's decision in Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992). This appeal followed.

II. Jurisdiction and Standard of Review

The district court had jurisdiction over the antitrust counts under 15 U.S.C. SS 15 and 26 and 28 U.S.C.

SS 1331 and 1337. It declined to exercise supplemental jurisdiction over the common law counts. We have

jurisdiction under 28 U.S.C. S 1291. Our review of the district court's dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) is plenary. Stehney v. Perry, 101 F.3d 925 (3d Cir. 1996).

III. Discussion

Plaintiffs assert six distinct antitrust claims on appeal. First, plaintiffs allege Domino's Pizza, Inc. has monopolized the market in pizza supplies and ingredients for use in Domino's stores, in violation of S 2 of the Sherman Act, 15 U.S.C. S 2. In support of this contention, plaintiffs allege Domino's Pizza, Inc. has sufficient market power to control prices and exclude competition in this market. Second, plaintiffs contend Domino's Pizza, Inc. has attempted to monopolize the market for Domino's pizza supplies and ingredients, in violation of S 2 of the Sherman Act. Third, plaintiffs allege Domino's Pizza, Inc.'s exclusive dealing arrangements have unreasonably restrained trade in violation of S 1 of the Sherman Act, 15 U.S.C.S 1. Fourth, plaintiffs allege Domino's Pizza, Inc. imposed an unlawful tying arrangement[5] by requiring franchisees to buy ingredients and supplies from them as a condition of obtaining fresh dough, in violation of the Sherman Act S 1, 15 U.S.C. S 1. Fifth, plaintiffs allege Domino's Pizza, Inc. imposed an unlawful tying arrangement by requiring franchisees to buy ingredients and supplies "as a condition of their continued enjoyment of rights and services under their Standard Franchise Agreement," in violation of S 1 of the Sherman Act, 15 U.S.C. S 1. Sixth, plaintiffs allege Domino's Pizza, Inc. has monopoly power in a relevant "market for reasonably interchangeable franchise opportunities facing prospective franchisees," in violation of S 2 of the Sherman Act, 15 U.S.C. S 2. This last claim was not raised before the district court.

As we have noted, the district court held that none of the

_____

5. "In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product." Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 200 (3d Cir. 1994).

plaintiffs' antitrust claims was cognizable under federal law. We will analyze each claim in turn.

A.

As a threshold matter, plaintiffs argue that "relevant market determinations are inherently fact intensive, and therefore are inappropriate for disposition on a Rule 12(b)(6) motion." (Appellant's brief at 16). It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers. See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992). Plaintiffs err, however, when they try to turn this general rule into a per se prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6).

Plaintiffs have the burden of defining the relevant market. Pastore v. Bell Telephone Co. of Pennsylvania , 24 F.3d 508, 512 (3d Cir. 1994); Tunis Bros Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962); Tunis Brothers, 952 F.2d at 722 (same). Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff 's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. See, e.g., TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); Tower Air, Inc. v. Federal Exp. Corp., 956 F. Supp. 270 (E.D.N.Y. 1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of

10

reasonable interchangeability is, standing alone, valid grounds for dismissal."); B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162 (S.D.N.Y. 1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable

interchangeability or explain rationale underlying narrow proposed market definition); Re-Alco Industries, Inc. v. Nat'l Center for Health Educ., Inc., 812 F. Supp. 387 (S.D.N.Y. 1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); E.& G. Gabriel v. Gabriel Bros., Inc., No. 93 Civ. 0894, 1994 WL 369147 (S.D.N.Y. 1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-elasticity of demand).

B.

Plaintiffs allege Domino's Pizza, Inc. has willfully acquired and maintained a monopoly in the market for ingredients, supplies, materials and distribution services used in the operation of Domino's stores, in violation of S 2 of the Sherman Act, 15 U.S.C. S 2. Section 2 sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations." "The offense of monopoly under S 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n. 19 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). See also Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 749 (3d Cir. 1996) (same); Bonjourno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 808 (3d Cir. 1984) (same).

11

The district court dismissed plaintiffs' S 2 monopoly claims for failure to plead a valid relevant market. Plaintiffs suggest the "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores" constitutes a relevant market for antitrust purposes. We disagree.

As we have noted, the outer boundaries of a relevant market are determined by reasonable interchangeability of use. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992); Brown Shoe Co. v. U.S. , 370 U.S. 294, 325 (1962); Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991). "Interchangeability

implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted). When assessing reasonable interchangeability, "[f]actors to be considered include price, use, and qualities." Tunis Brothers, 952 F.2d at 722. Reasonable interchangeability is also indicated by"cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962). As we explained in Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991), "products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." Tunis Brothers, 952 F.2d at 722.6

_____

6. Cross-elasticity is a measure of reasonable interchangeability. As one treatise observes: "The economic tool most commonly referred to in determining what should be included in the market from which one then determines the defendant's market share is cross-elasticity of demand. Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." E. Thomas Sullivan and Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications 217 (1994).

12

Here, the dough, tomato sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies. Indeed, it is the availability of interchangeable ingredients of comparable quality from other suppliers, at lower cost, that motivates this lawsuit. Thus, the relevant market, which is defined to include all reasonably interchangeable products, cannot be restricted solely to those products currently approved by Domino's Pizza, Inc. for use by Domino's franchisees. For that reason, we must reject plaintiffs' proposed relevant market.

Of course, Domino's-approved pizza ingredients and supplies differ from other available ingredients and supplies in one crucial manner. Only Domino's-approved products may be used by Domino's franchisees without violating

section 12.2 of Domino's standard franchise agreement. Plaintiffs suggest that this difference is sufficient by itself to create a relevant market in approved products. We disagree. The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but "commodities reasonably interchangeable by consumers for the same purposes." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956); Tunis Brothers, 952 F.2d at 722. A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general. Thus, the relevant inquiry here is not whether a Domino's franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might use such products interchangeably. Clearly, they could. Were we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws. Perhaps for this reason, no court has defined a relevant product market with reference to the

13

particular contractual restraints of the plaintiff.[7] Indeed, the only cases we have found involving similar claims rejected plaintiffs' position as a matter of law. See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange, 89 F.3d 233 (5th Cir. 1996) ("Economic power derived from contractual arrangements such as franchises or in this case, the agents' contract with Farmers', has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (internal citation and quotation omitted), cert. denied, ___ U.S. ___, 117 S. Ct. 960 (1997); Ajir v. Exxon Corp., No. C 93-20830, 1995 WL 429234, *3 (N.D. Ca.) ("Just because Exxon's direct serve dealers may contractually purchase gasoline from only one source-- Exxon -- does not mean that the relevant market is Exxon gasoline"; the correct relevant market is all gasoline). See also Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1570 n. 39 (11th Cir. 1991) (declining to reach issue but noting the district court rejected plaintiffs' claim that proposed market for sales of supplies to Long John Silver's fast food stores was a relevant market for antitrust purposes).

Plaintiffs argue that the Supreme Court's decision defining relevant markets in Eastman Kodak Co. v. Image

Technical Services, Inc., 504 U.S. 451 (1992) requires a different outcome. We disagree.

In Kodak, the Supreme Court observed that a market is defined with reference to reasonable interchangeability. Kodak, 504 U.S. at 482. The Court held that the market for repair parts and services for Kodak photo-copiers was a valid relevant market because repair parts and services for Kodak machines are not interchangeable with the service and parts used to fix other copiers. Id. Plaintiffs suggest that Kodak supports its proposed relevant market because it indicates that in some circumstances, a single brand of

_____

7. In Mozart Co. v. Mercedes-Benz of North America, 833 F.2d 1342 (9th Cir. 1987), the Court of Appeals for the Ninth Circuit observed that market power exists in three circumstances: where the government has granted a seller a patent or similar monopoly, where the seller possesses a unique product, or where the seller possesses a high market share. Id. at 1345-1346. The court made no mention of contractual limitations as a source of market power.

14

a product or service may constitute a relevant market. This is correct where the commodity is unique, and therefore not interchangeable with other products. But here, it is uncontested that contractual restraints aside, the sauce, dough, and other products and ingredients approved for use by Domino's franchisees are interchangeable with other items available on the market.

Plaintiffs contend that they face information and switching costs that "lock them in" to their position as Domino's franchisees, making it economically impracticable for them to abandon the Domino's system and enter a different line of business. They argue that under Kodak, the fact that they are "locked in" supports their claim that an "aftermarket" for Domino's-approved supplies is a relevant market for antitrust purposes. We believe plaintiffs misread Kodak.

The defendants in Kodak argued that there was no relevant market in Kodak repair parts, even if they were unique and non-interchangeable with other repair parts, because of cross-elasticity of demand between parts prices and copier sales. If the price of parts were raised too high, defendants contended, it would decrease demand for copiers.[8] The Court held that whether there was cross-elasticity of demand between parts and copiers was, in this case, a factual question that could not be determined as a matter of law. The Court reached this conclusion because

switching and information costs arise when one purchases
an expensive piece of equipment like a copier. In some
circumstances, these costs might create an economic lock-
in that could reduce or eliminate the cross-elasticity of

_____

8. In a typical antitrust case, plaintiffs assert that the products or
services in their proposed relevant market are reasonably
interchangeable because they possess positive cross-elasticity of
demand: a rise in the price of one product in the market will increase
demand for the other items in the market. By contrast, in Kodak the
defendants argued that Kodak copier parts, though not reasonably
interchangeable with the copiers themselves, were not a relevant market
because of negative cross-elasticity between parts and copiers: an
increase in the price of parts would, they argued, decrease demand for
copiers using those parts.

15

demand between copiers and the repair parts for those
copiers.

Kodak, we believe, held that a plaintiff's proposed
relevant market in a unique and non-interchangeable
derivative product or service cannot be defeated on
summary judgment by a defendant's assertion that the
proposed derivative market is cross-elastic with the primary
market, if there is a reasonable possibility that the
defendant's assertion about cross-elasticity is factually
incorrect. But Kodak does not hold that the existence of
information and switching costs alone, such as those faced
by the Domino's franchisees,9 renders an otherwise invalid
relevant market valid.10 In Kodak, the repair parts and
service were unique and there was a question of fact about
cross-elasticity. Judgment as a matter of law was therefore
inappropriate. Here, it is uncontroverted that Domino's-
approved supplies and ingredients are fully interchangeable
in all relevant respects with other pizza supplies outside the
proposed relevant market. For this reason, dismissal of the
plaintiffs' claim as a matter of law is appropriate.

Kodak is distinguishable from the present appeal in other
important respects. The Kodak case arose out of concerns
about unilateral changes in Kodak's parts and repairs
policies. When the copiers were first sold, Kodak relied on
purchasers to obtain service from independent service
providers. Later, it chose to use its power over the market
in unique replacement parts to squeeze the independent

_____

9. A franchisee considering exiting one franchise system faces
information costs associated with researching alternative investment

opportunities and switching costs stemming from the loss of invested funds that may not be recovered if it abandons its current business and start-up costs associated with the new venture.

10. If Kodak repair parts had not been unique, but rather, could be obtained from additional sources at a reasonable price, Kodak could not have forced copier purchasers to buy repair parts from Kodak. This would be true even if the copier purchasers faced information and switching costs that locked them into to use of Kodak copiers. This fact indicates that switching and information costs alone cannot create market power. Rather, it is the lack of a competitive market in the object to be purchased -- for instance, a competitive market in Kodak parts -- that gives a company market power.

16

service providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher cost. Because this change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision. In contrast, plaintiffs here knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement. Unlike the plaintiffs in Kodak, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage. That cannot be said of the conduct challenged in Kodak because it was not authorized by contract terms disclosed at the time of the original transaction. Kodak's sale of its product involved no contractual framework for continuing relations with the purchaser. But a franchise agreement regulating supplies, inspections, and quality standards structures an ongoing relationship between franchisor and franchisee designed to maintain good will. These differences between the Kodak transaction and franchise transactions are compelling.[11]

Plaintiffs also contend that Virtual Maintenance, Inc. v. Prime Computer, Inc., 11 F.3d 660 (6th Cir. 1993), supports their claim that the boundaries of a relevant market may be defined by contract. In Virtual Maintenance, Ford Motor Co. granted Prime Computer an exclusive right to market Ford-designed software and software revisions that automobile design companies must use to design cars for Ford. Prime Computer sold the software revisions only in a package with uncompetitive hardware maintenance services. The Court of Appeals for the Sixth Circuit held that Prime could

not legally exercise its monopoly power over software revisions to force customers to buy unwanted hardware maintenance contracts. Plaintiffs note that Prime's de facto monopoly power over software stemmed from a contract

_____

11. See Alan Silberman, The Myths of Franchise "Market Power", 65 Antitrust L.J. 181, 217 (1996).

with Ford, which they argue implies that the boundaries of a market may be defined by contract. But Prime had a monopoly because it possessed a unique product that no one else sold. Since the product was unique, and not interchangeable with any other products, it constituted its own relevant market for antitrust purposes. By contrast, Domino's does not sell a unique product or service. Franchisees must buy Domino's-approved supplies and ingredients not because they are unique, but because they are obligated by contract to do so.

Were we to accept plaintiffs' relevant market, virtually all franchise tying agreements requiring the franchisee to purchase inputs such as ingredients and supplies from the franchisor would violate antitrust law. Courts and legal commentators have long recognized that franchise tying contracts are an essential and important aspect of the franchise form of business organization because they reduce agency costs and prevent franchisees from free-riding -- offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product while benefitting from the quality control efforts of other actors in the franchise system. 12 Franchising is a bedrock of the American economy. More than one third of all dollars spent in retailing transactions in the United States are paid to franchise outlets.13  We do not believe the antitrust laws were designed to erect a serious barrier to this form of business organization.14

_____

12. See Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1349-50 (9th Cir. 1987); Alan J. Meese, Antitrust Balancing in a (Near) Coasean World: The Case of Franchise Tying Contracts, 95 Mich. L. Rev. 111, 117-119 (1996); Warren S. Grimes, When Do Franchisors Have Market Power?, 65 Antitrust L.J. 105 145-47 (1996); Benjamin Klein and Lester F. Saft, The Law and Economics of Franchise Tying Contracts, 28 J.L. & Econ. 345, 346-48 (1985).
13. Warren S. Grimes, When Do Franchisors Have Market Power?, 65 Antitrust L.J. 105, 105 n.1 (1996).

14. See United States v. Arnold, Schwinn & Co., 388 U.S. 365, 387 (1967)

(Stewart, J., concurring in part and dissenting in part) ("Indiscriminate invalidation of franchising arrangements would eliminate their creative contributions to competition and force suppliers to abandon franchising and integrate forward to the detriment of small business. In other words, we may inadvertently compel concentration by misguided zealousness.") (internal quotations omitted). The majority's opinion in Arnold was later overturned. See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977).

The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993). Here, plaintiffs' acceptance of a franchise package that included purchase requirements and contractual restrictions is consistent with the existence of a competitive market in which franchises are valued, in part, according to the terms of the proposed franchise agreement and the availability of alternative franchise opportunities. Plaintiffs need not have become Domino's franchisees. If the contractual restrictions in section 12.2 of the general franchise agreement were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have purchased a different form of restaurant, or made some alternative investment.[15] They chose not to do so. Unlike the plaintiffs in Kodak, plaintiffs here must purchase products from Domino's Pizza not because of Domino's market power over a unique product, but because they are bound by contract to do so. If Domino's Pizza, Inc. acted unreasonably when, under the franchise agreement, it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws. [16]

For these reasons, we agree with the district court that plaintiffs have not pleaded a valid relevant market.[17]

_____

15. As one scholar has noted, there are thousands of franchise opportunities available to investors and disclosure laws to help them make informed choices about these alternatives. George A. Hay, Is the Glass Half-Empty or Half-Full?: Reflections on the Kodak Case, 62 Antitrust L.J. 177, 188 (1993).

16. The dissent contends Domino's has acted in a "predatory way." But plaintiffs may have a right to sue for breach of contract.

17. The reasoning adopted by the district court in this case has been criticized recently by two other district court decisions. See Wilson v. Mobil Oil Corp., 940 F. Supp. 944 (E.D. La. 1996); Collins v. International

Dairy Queen, Inc., 939 F. Supp. 875 (M.D. Ga. 1996). In Wilson, the court disagreed with the district court's interpretation of Kodak, arguing that under Kodak information and switching costs alone, absent a unique product or service, may create a relevant market for antitrust purposes. As noted above, we disagree with this interpretation, for the Supreme Court specifically found that the copier parts involved in the

19

C.

Plaintiffs' claim for attempt to monopolize fails for the same reasons. To prevail on an attempted monopolization claim under S 2 of the Sherman Act, "a plaintiff must prove that the defendant (1) engaged in predatory or anti-competitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan , 506 U.S. 447, 456 (1993). Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 750 (3d Cir. 1996); Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1197 (3d Cir. 1995). In order to determine whether there is a dangerous probability of monopolization, a court must inquire "into the relevant product and geographic market and the defendant's economic power in that market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); Ideal Dairy Farms at 750; Pastore v. Bell Telephone Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir. 1994).

Plaintiffs' attempted monopoly claim is predicated on the identical proposed relevant market underlying its monopoly claim: a market in the ingredients, supplies, and materials used by Domino's pizza stores. Because the products within this proposed market are interchangeable with other products outside of the proposed market, the claim was properly dismissed.

D.

Plaintiffs allege exclusive dealing arrangements entered into by Domino's Pizza, Inc. have unreasonably restrained

_____

case were unique. The basis of the Collins court's criticism of the district
court's decision here is less clear, though it appears the court believed that the district court's holding was too expansive. The Collins court apparently wished to reserve judgment whether some franchise tying arrangements might be deemed anti-competitive in the future. The approach taken by the district court in this case has received support in recent scholarly literature. See Alan J. Meese, Antitrust Balancing in a (Near) Coasean World: The Case of Franchise Tying Contracts, 95 Mich.

L. Rev. 111, 128 (1996) ("economic theory suggests . . . that tying contracts that actually reduce free riding are unrelated to any exercise of market power"); Alan H. Silberman, The Myths of Franchise "Market Power", 65 Antitrust L.J. 181 (1996).

trade in violation of S 1 of the Sherman Act, 15 U.S.C. S 1. Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. S 1.

To establish a section 1 violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. Mathews v. Lancaster General Hospital , 87 F.3d 624, 639 (3d Cir. 1996); Orson Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1229 (3d Cir. 1993).

Plaintiffs allege defendant's actions caused anti-competitive effects within the market for ingredients and supplies used by Domino's pizza stores. Again, this claim fails because the products within the proposed market are interchangeable with products outside the proposed market.18

E.

Plaintiffs allege Domino's Pizza, Inc. imposed an unlawful

_____

18. Monopoly power under S 2 requires "something greater" than market power under S 1. Kodak, 504 U.S. at 481. This does not imply, however, that the analyses employed in the two types of cases to define relevant markets differ. In the past, we intimated that the relevant market analysis required under S 2 of the Sherman Act was "instructive" in S 1 cases, though perhaps not identical. See Tunis Bros., 952 F.2d at 724 n. 3. The Supreme Court and lower courts have consistently held that relevant markets under both sections are defined by the same two factors: reasonable interchangeability of use and cross-elasticities of demand. See, e.g., Allen-Myland , 33 F.3d at 201 and 201 n. 8 (applying Brown Shoe relevant market test of reasonable interchangeability and cross-elasticity of demand in S 1 tying case). In this case, we see no difference in the relevant market analyses required under the two provisions.

tying arrangement by requiring franchisees to buy ingredients and supplies from them as a condition of obtaining Domino's Pizza fresh dough, in violation of S 1 of the Sherman Act, 15 U.S.C. S 1. "In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product." Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 200 (3d Cir. 1994). "[T]he antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market." Id. "Even if a seller has obtained a monopoly in the tying product legitimately (as by obtaining a patent), courts have seen the expansion of that power to other product markets as illegitimate and competition suppressing." Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 475 (3d Cir. 1992). "The first inquiry in any S 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination precisely what the tying and tied products markets are." Allen-Myland, 33 F.3d at 200-201.

Here, plaintiffs allege Domino's Pizza, Inc. used its power in the purported market for Domino's-approved dough to force plaintiffs to buy unwanted ingredients and supplies from them. This claim fails because the proposed tying market -- the market in Domino's-approved dough-- is not a relevant market for antitrust purposes. Domino's dough is reasonably interchangeable with other brands of pizza dough, and does not therefore constitute a relevant market of its own. All that distinguishes this dough from other brands is that a Domino's franchisee must use it or face a suit for breach of contract. As we have noted above, the particular contractual restraints assumed by a plaintiff are not sufficient by themselves to render interchangeable commodities non-interchangeable for purposes of relevant market definition. If Domino's had market power in the overall market for pizza dough and forced plaintiffs to purchase other unwanted ingredients to obtain dough,

plaintiffs might possess a valid tying claim. But where the

defendant's "power" to "force" plaintiffs to purchase the alleged tying product stems not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie. For that reason, plaintiffs' claim was properly dismissed.

F.

Plaintiffs allege Domino's Pizza, Inc. imposed an unlawful tie-in arrangement by requiring franchisees to buy ingredients and supplies "as a condition of their continued enjoyment of rights and services under their Standard Franchise Agreement," in violation of S 1 of the Sherman Act, 15 U.S.C. S 1. This claim is meritless. Though plaintiffs complain of an illegal tie-in arrangement, they have failed to point to any particular tying product or service over which Domino's Pizza, Inc, has market power. Domino's Pizza's control over plaintiffs' "continued enjoyment of rights and services under their Standard Franchise Agreement" is not a "market." Rather, it is a function of Domino's contractual powers under the franchise agreement to terminate the participation of franchisees in the franchise system if they violate the agreement. Because plaintiffs failed to plead any relevant tying market, the claim was properly dismissed.

G.

On appeal, the plaintiffs advance a new claim based on a different relevant market theory -- that Domino's has a monopoly in a relevant market comprised of pizza franchise opportunities of the type that Domino's Pizza, Inc. offers. Plaintiffs raise this new theory, which the district court did not address, in the hopes of obtaining a remand.

Plaintiffs' argument that Domino's Pizza has monopolized a relevant market comprised of franchise opportunities of a particular sort was not raised or mentioned in their complaint, first amended complaint, memorandum of law in support of their motion for leave to file a second amended complaint, or in the "claims for relief" section of the proposed second amended complaint. When the district

23

court denied plaintiffs leave to file a second amended complaint, on grounds of futility, it had no idea that plaintiffs intended or desired to raise such a claim. "This court has consistently held that it will not consider issues that are raised for the first time on appeal." Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994).

Nonetheless, plaintiffs argue that this claim was raised before the district court. In support of this contention, they note that facts which might support such a claim were pleaded in paragraphs 60 and 65 of their proposed second amended complaint. Though we construe pleadings liberally, plaintiffs have a duty to make the district court aware that they intend to rely on a particular relevant market theory. This is particularly true in a complex case like this one, where plaintiffs bring multiple antitrust claims based on multiple and alternative relevant market theories. See Pastore v. Bell Telephone Co. of Pennsylvania, 24 F.3d 508, 513 (3d Cir. 1994) (plaintiff bound by relevant market theory raised before district court); TV Communications Network. Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992) (same); Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 117 (3d Cir. 1980) (same). We do not believe a fleeting reference in a proposed second amended complaint to facts that might support a proposed relevant market is sufficient, on its own, to preserve that relevant market theory for appellate review. See Frank v. Colt Industries, Inc., 910 F.2d 90, 100 (3d Cir. 1990) (issues not raised before district court are waived on appeal; fleeting reference to issue before district court insufficient to preserve it for appellate review). "Particularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue." Id. at 100. Because this claim was not properly raised before the district court and is not properly before us, we decline to address it. See generally Salvation Army v. Department of Community Affairs of State of N.J., 919 F.2d 183, 196 (3d Cir. 1990) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of each case.").

24

H.

Plaintiffs also contend the district court held that the availability of contract remedies prohibited recovery under antitrust laws. But this misstates the district court's holding. The district court held that Domino's Pizza's ability to block franchisees from purchasing ingredients from other sources stemmed from its exercise of contractual powers, not market power, and the remedy for this problem lies, if at all, under contract law. The court did not say that as a matter of law the availability of common law remedies prohibits recovery under an antitrust theory. We see no error.

I.

The district court declined to exercise supplemental jurisdiction over the plaintiffs' remaining state law contract claims. This decision is committed to the sound discretion of the district court. Stehney v. Perry, 101 F.3d 925, 939 (3d Cir. 1996); Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993). Because all federal claims were correctly dismissed and dismissal of the remaining contract claims would not be unfair to the litigants or result in waste of judicial resources, we see no abuse of discretion.

IV.

For the foregoing reasons, we will affirm the judgment of the district court.

25

LAY, Circuit Judge, dissenting.

I respectfully dissent.

The district court, at the pleading stage, dismissed plaintiffs' complaint alleging violations under S 1 and S 2 of the Sherman Antitrust Act holding that plaintiffs failed to allege a relevant market. The issue is complex. Judge Scirica's opinion is logically reasoned. Our differences lie in the interpretation and application of the Supreme Court's recent opinion in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992). I respectfully submit, for the reasons that follow, that the district court's opinion in this case rests on several incorrect hypotheses. To the extent that the majority adopts the district court's rationale, I dissent.

The district court rejected as a matter of law the plaintiffs' alleged relevant market, that of the derivative aftermarket for ingredients and supplies among Domino's Pizza, Inc. ("DPI")'s franchisees. The district court found that "[t]he economic power DPI possesses results not from the unique nature of the product or from its market share in the fast food franchise business, but from the franchise agreement."1

_____

1. The district court relied on "two influential commentators," Benjamin Klein and Lester F. Saft, The Law and Economics of Franchise Tying Contracts, 28 J.L. & Econ. 345, 356 (1985) and two pre-Kodak cases, Mozart Co. v. Mercedes-Benz of North America, Inc. , 833 F.3d 1342 (9th Cir. 1987), and Tominaga v. Shepard, 682 F. Supp. 1489 (C.D. Cal.

1988). The district court adopted the Ninth Circuit's analysis from Mozart that an alleged economic-lock-in is irrelevant to the determination of a defendant's market power. See Tominaga, 682 F. Supp. at 1494 (quoting Mozart, 833 F.2d at 1346-47). This reasoning is simply irreconcilable with the Supreme Court's analysis of information and switching costs in Kodak. See Kodak, 504 U.S. at 473-77.

It should also be noted Professor Klein recognized, contrary to his original thesis, that Kodak permits the recognition of market power in a derivative aftermarket "despite the absence of market power in the equipment market, by taking advantage of imperfectly informed consumers that become `locked-in' to their existing Kodak equipment." See Benjamin Klein, Market Power in Antitrust: Economic Analysis After Kodak, 3 Sup. Ct. Econ. Rev. 43, 48 (1993).

26

The plaintiffs allege that DPI has harmed the competitive process by "foreclos[ing] interbrand competition in the market for distributing approved Ingredients and Supplies to Domino's franchisees." The plaintiffs argue that DPI prevented a franchise cooperative and other distributors of ingredients and supplies from entering that market. By stopping any interbrand competition for ingredients and supplies for DPI franchisees, DPI, according to the pleadings, has excluded other potential distributors, and thereby preempted market forces from disciplining the sale of ingredients and supplies.

Interchangeability

In adopting the district court's approach to relevant market definition, the majority reasons that all ingredients and supplies, whether or not approved by DPI, are interchangeable for making pizzas generally and therefore must be included within the relevant market. Kodak made a similar argument. As in Kodak, this ignores the reality that there are no substitutes for ingredients and supplies sold only by DPI. The majority's approach to the interchangeability concept is not faithful to the purpose of interchangeability analysis or the Supreme Court's understanding of market definition and power. The purpose of analyzing interchangeability is to find competing products which are reasonable substitutes and thereby prevent market power.2 In Kodak, the question was whether the cross-elasticity of demand between the equipment market and the derivative aftermarkets for parts and service was sufficient to deprive Kodak of market power. Our question is whether the interchangeability of, or cross-elasticity of demand between, DPI-approved ingredients and supplies and other ingredients and supplies is sufficient to make the alleged relevant market invalid. The issue,

whether under the framework of market power as it was in
Kodak, or as market definition as here, is whether

_____

2. The basic definition of market power is "the power to raise prices
above competitive levels without losing so many sales that the price
increase is unprofitable." Herbert Hovenkamp, Federal Antitrust Policy:
The Law of Competition and its Practice S 3.1, at 79 (1994) (footnote
omitted).

competition from other providers of ingredients and
supplies for pizzas will restrain the power of DPI over
ingredients and supplies it sells to franchisees. See Kodak,
504 U.S. at 469 n.15. The plaintiffs allege not only that
they are limited to buying ingredients and supplies from
DPI, but also that information and switching costs
prevented them from anticipating and being able to respond
to DPI's power to substantially raise price for the
ingredients and supplies. They allege that competition from
independent providers of ingredients and supplies does not
restrain DPI's power in the aftermarket for ingredients and
supplies, and therefore ingredients and supplies not
approved by DPI need not be included in the relevant market.3

Information and Switching Costs

A closely related problem with the district court's opinion
is its scant treatment of information and switching costs
and their relevance to defining a valid relevant market. The
plaintiffs argue that they have experienced information and
switching costs which have prevented them from

_____

3. The majority, in footnote 17, ante at 20, states that the district
court's
approach has "received support in recent scholarly literature," citing
Alan J. Meese, Antitrust Balancing in a (Near) Coasean World: The Case
of Franchise Tying Contracts, 95 Mich. L. Rev. 111, 128 (1996). However,
Professor Meese does not argue that the approach taken is correct under
current antitrust law. In fact, on page 126 he concedes that the Kodak
decision "found that the existence of relationship-specific investments
can confer `market power' ", and at 152-55 he states that "under current
law" franchisors may have market power over derivative aftermarkets
due to "lock-in" of the franchisees, and because of this he proposes a
new framework for analyzing such claims. He argues that "the focus on
market power and less restrictive alternatives, though perfectly natural
given the partial equilibrium framework that dominates antitrust law
and the premises that underlie tying jurisprudence," does not properly
apply to the franchise tying context. Id. at 128. Professor Meese argues
that tying contracts that reduce free riding, a form of opportunistic

behavior taken at the expense of the franchise system, should be prima facie legal. Whatever the value of Professor Meese's argument, he presupposes that "under current law" from the Supreme Court the district court in this case may have erred. Id. at 152. In addition, it is not even clear that Professor Meese would find the plaintiffs' allegations insufficient as a matter of law because they allege that DPI charged supracompetitive prices for the ingredients and supplies. See id. at 155.

anticipating or responding to the price increases for ingredients and supplies from DPI. They argue that these information and switching costs create a "lock-in" which makes the aftermarket for DPI-approved ingredients and supplies the relevant market. Specifically, the imperfect information they proffer is that the franchisees "could not foresee that Domino's would not follow the policy represented in its Offering Circular and would, instead, commence excluding potential suppliers in order to foreclose competition in the aftermarket." They suggest switching costs arise from sunk costs in the franchise, limits on franchisees's ability to sell their franchise, and noncompetition covenants in the Standard Franchise Agreement.

An important part of the Supreme Court's decision in Kodak that the plaintiffs presented a triable claim was that "there is a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another." Kodak, 504 U.S. at 477. In fact, other circuit courts have held that the presence of these market imperfections was the crucial factor in Kodak, and that had Kodak's policy been known at the time businesses bought copiers from Kodak, the result would have been different.[4] See PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 820 (6th Cir. 1997) ("We likewise agree that the change in policy in Kodak was the crucial factor in the Court's decision. By changing its policy after its customers were `locked in,' Kodak took advantage of the fact that its customers lacked the information to anticipate this change."), cert. denied, 1997 WL 195257; see also Digital Equip. Corp. v. Uniq Digital Techs., Inc., 73 F.3d 756, 763 (7th Cir. 1996); Lee v. Life Ins. Co. of North America, 23

_____

4. This conclusion seems quite sensible. If Kodak customers knew about Kodak's subsequent parts-and-service policy when they bought the copiers, or were not economically restricted from switching to other copiers, then Justice Scalia's dissent, which assumes a perfect competition/perfect information world, should be right. Kodak is merely a concession to fact that markets do not always work perfectly, and

sometimes, but not always, these imperfections can create sufficient market power to justify possible antitrust liability.

29

F.3d 14, 20 (1st Cir. 1994). Several commentators have described how the analysis from Kodak could mean that franchisors' derivative aftermarkets may be relevant antitrust markets. Meese, 95 Mich. L. Rev. at 152 ("Under current law, [post-contract market power] can arise once the cost to the franchisee of switching to a different franchise is significant. . . ."); Warren S. Grimes, When Do Franchisors Have Market Power? Antitrust Remedies For Franchisor Opportunism, 65 Antitrust L.J. 105, 112 (1996) ("A franchisor has market power if it can, without losing substantial sales, raise the price of a good or service sold to a franchisee above the level at which an equivalent good or service is available from other suppliers."); see also Robert H. Lande, Chicago Takes It On The Chin: Imperfect Information Could Play A Crucial Role In The Post-Kodak World, 62 Antitrust L.J. 193, 195 (1993) ("Another important lesson of Kodak is that imperfect information can be a crucial factor in defining relevant markets."). But see Alan Silberman, The Myths of Franchise "Market Power", 65 Antitrust L.J. 181, 217 (1996).

Uniqueness

In rejecting the plaintiffs' theory that the information and switching costs they face justify the alleged relevant market under Kodak, the majority states: "Kodak does not hold that the existence of information and switching costs alone, such as those faced by the Domino's franchisees, renders an otherwise invalid relevant market valid." Ante at 16 (footnotes omitted). Both the district court and the majority make a more difficult argument, that a necessary factor in Kodak was that the repair parts were "unique." They state that this uniqueness is what gave Kodak market power, and that the lack of this factor herein warrants rejecting the plaintiffs' alleged relevant market. The basis for not applying Kodak in this case lies in two arguments: (1) the aftermarket ingredients and supplies are not unique, and (2) the franchisees knew of the policy bec